# United States Court of Appeals
## *for the*
## Eleventh Circuit

---

AST & SCIENCE LLC,

*Plaintiff-Counter Defendant-Appellee,*

– v. –

DELCLAUX PARTNERS SA,

*Defendant-Counter Claimant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA, IN CASE NO. 1:20-CV-23335-DPG
(HONORABLE DARRIN P. GAYLES)

## BRIEF FOR PLAINTIFF-COUNTER DEFENDANT-APPELLEE

MARK J. NEUBERGER
FOLEY & LARDNER LLP
2 South Biscayne Boulevard
Miami, Florida 33133
(305) 482-8400

GEOFFREY M. RAUX
FOLEY & LARDNER, LLP
111 Huntington Avenue
Boston, Massachusetts 02199
(617) 342-4000

*Attorneys for Plaintiff-Counter Defendant-Appellee*

 COUNSEL PRESS    (800) 4-APPEAL • (810362)

***AST & Science LLC v. Delclaux Partners SA,***
**Case No. 23-11985-HH**

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Appellee, AST & Science LLC (AST), submits this list, which includes the trial judge, and all attorneys, persons, associations of persons, firms, partnerships or corporations that have an interest in the outcome of this proceeding:

1. AST & Science LLC (AST) - Plaintiff-Appellee

2. Delclaux Partners SA (Delclaux) - Defendant-Appellant

3. Delclaux, Pedro - Co-Owner of Delclaux

4. Foley & Lardner LLP- Counsel for AST

5. Fornaro, Matthew- Former Counsel for Delclaux

6. Gayles, Darrin P. – U.S. District Judge

7. Greenberg Traurig, P.A. – Counsel for Delclaux

8. Holaday, Mark – Co-Owner of Delclaux

9. Law Office of William Coudert Rand- Former Counsel for Delclaux

10. LionTree Advisors LLC -privately owned broker dealer

11. Mamounas, Joseph J. - Counsel for Delclaux

12. Matthew Fornaro, P.A. -Former Counsel for Delclaux

13. Neuberger, Mark J. - Counsel for AST

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT
### (Continued)

14. Nunez, Adrian - Counsel for Delclaux

15. Otazo-Reyes, Alicia M. - U.S. Magistrate Judge

16. Pandher, Bethany J. M. – Counsel for Delclaux

17. Picco, Andrea - Counsel for AST

18. Rand, William C. - Former Counsel for Delclaux

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3 and 27-1(6), AST makes the following statement as to its corporate ownership:

AST has no parent corporation. AST SpaceMobile, Inc. ("SpaceMobile"), which is publicly traded on the NASDAQ Stock exchange under the trading symbol ASTS and whose Warrants trade under the trading symbol ASTSW, is AST's Managing Member and owns 10% or more of the stock. In addition, the following persons or entities own 10% or more of the stock in AST:

Abel Avellan

Rakuten Mobile USA Service, Inc.

*/s/ Mark J. Neuberger*

**STATEMENT REGARDING ORAL ARGUMENT**

Delclaux's challenges to the District Court's judgment do not present any substantial questions of fact or law that would be aided by oral argument. The District Court's analysis was clear, comprehensive, and correct. Federal question jurisdiction was pled by AST in its Complaint, was affirmed by the District Court, and was never questioned by Delclaux until after judgment was entered. On sound and well-established legal and factual grounds, the District Court rejected Delclaux's after-the-fact challenge. This Court should readily affirm the District Court without oral argument.

The merits are equally straightforward. Contrary to Delclaux's assertions, there are no "procedural complexities" or "incorrect rulings" that oral argument would aid in navigating. Delclaux's Amended Counterclaim was premised on the interpretation of a contract to which it is not a party. Delclaux's interpretation, moreover, has zero support in the record. As the District Court noted, Delclaux fell "short of its obligation under Fed. R. Civ. P. 56(c)(1)(A) to cite to particular parts of the record that support its characterization," and "failed to point to any relevant extrinsic evidence supporting its interpretation…" Doc 114 - pg. 15. The record evidence uniformly supported AST's position, and was found to be "undisputed." *Id.* at 16. Summary judgment entered for AST as a result, and it should now be affirmed without the need for oral argument.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
  DISCLOSURE STATEMENT...................................................C-1

CORPORATE DISCLOSURE STATEMENT ....................................C-2

STATEMENT REGARDING ORAL ARGUMENT ..............................i

TABLE OF AUTHORITIES ........................................................iv

STATEMENT OF JURISDICTION...............................................1

STATEMENT OF ISSUES .........................................................1

STATEMENT OF THE CASE AND FACTS ....................................2

    I.     STATEMENT OF THE CASE................................................2

    II.    STATEMENT OF THE FACTS..............................................3

    III.   STANDARD OF REVIEW ...................................................6

SUMMARY OF ARGUMENT ....................................................6

ARGUMENT .......................................................................11

    I.     SUBJECT MATTER JURISDICTION WAS DIRECTLY
         PLEADED IN THE COMPLAINT, WAS
         ACKNOWLEDGED BY ALL PARTIES DURING THE
         CASE, AND WAS CORRECTLY AFFIRMED BY THE
         DISTRICT COURT IN RESPONSE TO DELCLAUX'S
         AFTER-THE-FACT CHALLENGE .................................11

        A.    The District Court Had Federal Question Jurisdiction
            Under 28 U.S.C. § 1331............................................12

            1.   Federal Issues were Necessarily Raised........................14

            2.   Federal Issues were Actually Disputed ..........................19

            3.   Federal Issues were Substantial.....................................20

            4.   The Federal State Balance was Not Disturbed...............23

        B.    The District Court Had Exclusive Jurisdiction Under
            15 U.S.C. § 78aa(a)..................................................24

II.    THE TWO INDEPENDENT BASES ON WHICH THE
       DISTRICT COURT ENTERED SUMMARY JUDGMENT
       IN AST'S FAVOR WERE SOUND AND SHOULD BE
       AFFIRMED. ...................................................................................27

       A.    There Was No Record Evidence That Fees Had
             "Become Payable" To LionTree—A Necessary
             Condition Precedent For Delclaux To Recover Fees ...............27

       B.    All Of The Record Evidence Supported AST's
             Construction Of The Tail Provisions, And The
             Undisputed Facts Demonstrated That No Fees Were
             Owed ......................................................................................30

III.   THE DISTRICT COURT CORRECTLY REJECTED
       DELCLAUX'S UNSUPPORTED AND UNPLEADED
       CLAIMS AND THEORIES UNDER THE RIGHT OF
       FIRST REFUSAL ............................................................................44

IV.    THIS COURT CAN AFFIRM THE DISTRICT COURT'S
       JUDGMENT ON ADDITIONAL GROUNDS ..................................49

CONCLUSION .......................................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abott v. Equity Group, Inc.*,
2 F.3d 613 (5th Cir. 1993) ..............................................................................51

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...........................................................................................6

*Berckeley Inv. Group, Ltd. v. Colkitt*,
455 F.3d 195 (3d Cir. 2006) ...........................................................................51

*Bruan, Gordon & Co. v. Hellmers*,
502 F. Supp. 897 (S.D.N.Y. 1980) ........................................................... 18, 19

*Brumberg, Mackey & Wall, P.L.C.*,
SEC No–Action Letter, 2010 WL 1976174 (May 17, 2010) .......................23

*Cambridge Capital LLC v. Ruby Has LLC*,
2021 U.S. Dist. LEXIS 188635 (S.D.N.Y. Sept. 30, 2021) .........................46

*Caterpillar Inc. v. Williams*,
482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987) .......................... 12, 13

*CBS, Inc. v. Primetime 24 Joint Venture*,
245 F.3d 1217 (11th Cir. 2001) ......................................................................52

*National Conv. Corp. v. Bldg. Corp.*,
23 N.Y.2d 621 (N.Y. 1969) .............................................................. 46, 47, 48

*Compagnie Financiere de CIC et de l'Union Europeenne v.*
*Merrill Lynch, Pierce, Fenner & Smith Inc.*,
232 F.3d 153 (2d Cir. 2000) ...........................................................................34

*Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*,
No. 8:04CV586, 2006 WL 2620985 (D. Neb. Sept. 12, 2006).....................20

*D'Alessio v. New York Stock Exchange, Inc.*,
258 F.3d 93 (2d Cir. 2001) ........................................................................ 14, 22

*Davis v. Eagle Oil & Gas Co.*,
No. 08-CA-107, 2008 WL 11334171 (W.D. Tex. Oct. 10, 2008) ...............18

*Demaria v. Gisbex Clearing Corp., S.A.*,
2010 WL 11553316 (S.D. Fla. Nov. 23, 2010) .............................................51

iv

*Empire Fin. Group, Inc. v. Fin. Indus. Regulatory Auth., Inc.*,
08-80534-CIV, 2009 WL 10644856 (S.D. Fla. Jan. 15, 2009) .................... 22

*Empire Healthchoice Assur., Inc. v. McVeigh*,
547 U.S. 677 (2006) .......................................................................... 12

*Giles v. City of New York*,
41 F. Supp. 2d 306 (S.D.N.Y. 1999) ................................................ 33

*Gilmour v. Gates, McDonald & Co.*,
382 F.3d 1312 (11th Cir. 2004) ...................................................... 45

*Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*,
545 U.S. 308 (2005) .......................................................................... 12

*Greenwich Capital Fin. Prods., Inc. v Negrin*,
74 A.D.3d 413 (N.Y. App. Div. 2010) ............................................ 46

*Gunn v. Minton*,
568 U.S. 251 (2013) .......................................................................... 12

*In re Pennetta*,
19 B.R. 794 (Bankr. D. Colo. 1982) ................................................ 29

*In re Ripley*,
926 F.2d 440 (5th Cir. 1991) ............................................................ 28

*Luver Plumbing Heating, Inc. v. Mo's Pluimbing & Heating*,
144 A.D.3d 587 (N.Y. App. Div. 2016) .......................................... 46

*Mac's Shell Serv., Inc. v. Shell Oil Products Co., LLC*,
559 U.S. 175 (2010) .......................................................................... 52

*Mata Chorwadi, Inc. v. City of Boynton Beach*,
66 F. 4th 1259 (11th Cir. 2023) ...................................................... 49

*MBL Contr. Corp. v. King World Prods., Inc.*,
98 F. Supp. 2d 492 (S.D.N.Y. 2000) ................................................ 31

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*,
578 U.S. 374 (2016) .......................................................................... 24

*Mobil Oil Corp. v. Coastal Petroleum Co.*,
671 F.2d 419 (11th Cir. 1982) ........................................................ 18

*NASDAQ OMX Group, Inc. v. UBS Securities, LLC*,
770 F.3d 1010 (2d Cir. 2014) .......................................................... 14

*Newman v. Ormond*,
    396 Fed. Appx. 636 (11th Cir. 2010) ............................................................45

*Norris v. Brady*,
    2023 WL 2768412 (S.D. Fla. Apr. 4, 2023)......................................... 18, 24

*Payne v. J.B. Hunt Transp., Inc.*,
    709 F. App'x 647 (11th Cir. 2017)................................................................6

*Peebles v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    431 F.3d 1320 (11th Cir. 2005) ....................................................................6

*Regional Properties, Inc. v. Financial and Real Estate Consulting Co.*,
    678 F.2d 552 (5th Cir. 1982) ......................................................................51

*Roman v. Hooters Spring Hill, Inc.*,
    816CV01332T24MAP, 2016 WL 8997452 (M.D. Fla. July 8, 2016) .........18

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*,
    No. 14-CV-04394, 2016 U.S. Dist. LEXIS 120131
    (S.D.N.Y. Aug. 31, 2016)............................................................................31

*Rozar v. Mullis*,
    85 F. 3d 556 (11th Cir. 1996) .....................................................................49

*SEC v. Bankatlantic Bancorp, Inc.*,
    Case No. 12-60082-civ-Scola/Otazo-Reyes, 2013 WL 12009694
    (S.D. Fla. Nov. 14, 2013) ............................................................................23

*SEC v. Spartan Securities Group, LTD*, Case,
    No. 8:19-cv-448-T-33CPT, 2020 WL 7024884 (M.D. Fla. Nov. 30,
    2020) ...........................................................................................................23

*Smith v Kansas City Title & Tr. Co.*,
    255 U.S. 180 (1921).....................................................................................11

*Turbeville v. Dep't of Fin. Services*,
    248 So. 3d 194 (Fla. 1st DCA 2018) ...........................................................22

*Turbeville v. FINRA*,
    874 F.3d 1268 (11th Cir. 2017) ...................................................................24

*Walker v. Darby*,
    911 F.2d 1573 (11th Cir. 1990) .....................................................................6

**Statutes & Other Authorities:**

15 U.S.C. § 78aa(a) ........................................... 1, 10, 11, 22, 24, 25, 26, 27

15 U.S.C. § 78o(a)(1) ..................................................................... 13, 15, 20

15 U.S.C. § 78o(b)(8) ...................................................................................20

28 U.S.C. § 1291 ............................................................................................1

28 U.S.C. § 1331 ................................... 1, 11, 12, 13, 14, 18, 24, 26

28 U.S.C. § 1367 .........................................................................................18

17 C.F.R. § 240.15b9-1 ..............................................................................20

Fed. R. Civ. P. 12(b)(1) ..............................................................................49

Fed. R. Civ. P. 56 ..........................................................................................6

FINRA Rule 2040 ............................................................... 13, 15, 51

**STATEMENT OF JURISDICTION**

Final judgment in this lawsuit was entered by the United States District Court for the Southern District of Florida. Pursuant to 28 U.S.C. § 1291, this Court has jurisdiction over Delclaux's appeal from that final judgment.

Delclaux challenges the subject matter jurisdiction exercised by the District Court as part of its appeal. This challenge is groundless. The District Court exercised subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa(a). AST pleaded federal question jurisdiction in its Complaint, and the District Court confirmed that AST's right to relief depended upon the construction and application of federal law.

**STATEMENT OF ISSUES**

1. Whether the District Court correctly exercised subject matter jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa(a) where AST's claim for relief turned on alleged violations of United States Securities laws?

2. Whether the District Court correctly granted summary judgment in favor of AST on Delclaux's Amended Counterclaim where that Amended Counterclaim was premised on the interpretation of a contract to which Delclaux was not a party, where no evidence in the record supported that interpretation, and where the undisputed facts demonstrated that no breach occurred?

## STATEMENT OF THE CASE AND FACTS

## I.    STATEMENT OF THE CASE

AST filed this lawsuit on August 11, 2020 alleging that Delclaux breached the Parties' contract by acting as an unregistered broker-dealer in violation of United States Securities laws, and by failing to obtain membership with the Financial Industry Regulatory Authority ("FINRA") as required under federal regulations. Doc 1 – pg. 9.  In response, on December 29, 2020, Delclaux filed its Amended Answer, Affirmative Defenses, and Counterclaim.  Doc 17.  On January 7, 2021, AST filed a Motion to Dismiss on the basis that Delclaux lacked standing insofar as it was attempting to litigate the purported legal rights of a non-party—LionTree Advisors LLC ("LionTree").  Doc 21.  The District Court denied AST's Motion on August 17, 2021.  Doc 49.

The Parties then engaged in lengthy and significant discovery, including expert discovery.  Both Parties had ample time to gather the evidence needed to prove their respective claims.  On February 27, 2023, the District Court entered summary judgment in AST's favor on the Amended Counterclaim after finding that Delclaux had no record evidence to support its position.  Doc 136.

Delclaux appealed to this Court on March 29, 2023, but dismissed the appeal after recognizing that it was untimely.  The Parties then settled AST's claim and final judgment was entered.  Delclaux filed this appeal on June 9, 2023, but also

filed a motion to vacate with the District Court based on a supposed lack of jurisdiction. The District Court denied that motion on February 23, 2024, and this appeal resumed.

## II. STATEMENT OF THE FACTS

AST was founded in 2017 and is in the business of satellite technology and global satellite-based communications. AST began working with Delclaux in late 2017 as it prepared to initiate its initial round of financing. Doc 72 – pg. 2, ¶ 1. Delclaux introduced AST to LionTree, and, on November 20, 2017, AST contracted with LionTree to assist in its financing efforts. *Id*. at ¶ 4. The contract with LionTree (the "LionTree Agreement") sets forth the scope of services that LionTree would render, the rights and obligations of the parties, and the fees and expenses that AST would pay for LionTree's work. Doc 70-4. The contract makes no mention of Delclaux, Delclaux is not a party to it, and Delclaux had no hand in its drafting or negotiation. Doc 72 – pg. 2, ¶ 5.

Delclaux has a separate contract governing its relationship with AST—the Finder's Fee Agreement. *Id.* at pg. 3, ¶¶ 10-11. The Finder's Fee Agreement provides for two scenarios under which Delclaux would be entitled to payment from AST. Doc 70-3 – pg. 4, § 2. The first involved the direct investment by certain specified parties to whom Delclaux had introduced AST. *Id*. Those parties ultimately made no investments, hence, that provision is not relevant. The second

payment scenario involved payments made by AST to LionTree. *Id.* If investment banking fees became payable to LionTree at the close of a "Financing," then Delclaux would also be entitled to a fee. *Id.* This contingent fee was calculated as a percentage of the amount payable to LionTree and was granted to Delclaux in consideration of Delclaux's introduction of LionTree to AST in October 2017. *Id.*

With the help of LionTree, AST completed a successful Series A financing in June 2018. Doc 72 – pg. 3, ¶ 12. At the close of the round, LionTree presented an invoice for payment to AST and was subsequently paid. *Id.* at ¶ 13. AST also made payment to Delclaux in an amount based on and determined by the payment made to LionTree. *Id.* at ¶ 14.

AST then began its Series B round. Near the start of the round, AST decided to hire a new investment banker, and, by letter dated January 29, 2019, AST terminated its engagement with LionTree. *Id.* at ¶¶ 15-16. Working with its new investment banker, AST closed four transactions in October 2019 and February 2020, respectively, with subsidiaries of Vodafone Group PLC ("Vodafone"), American Tower LLC ("American Tower"), and Rakuten, Inc. ("Rakuten"), and with Samsung Next Fund, LLC ("Samsung Next"). *Id.* at pg. 4, ¶ 20.

Delclaux demanded fees from these transactions based on the contingent payment provision in the Finder's Fee Agreement. *Id.* at ¶¶ 21-22. AST explained that LionTree had no involvement in the transactions and no fees had become

payable to LionTree, hence, no fees were owed to Delclaux. *Id.* at pg. 6, ¶ 36. Delclaux refused to accept that. *Id.* at ¶ 37. It began to press LionTree to assert its own claim for fees under the so-called "Tail Provisions" in the LionTree Agreement. *Id.* at ¶ 39. When that did not work, Delclaux began to send harassing emails to AST and its Board of Directors. *Id.* at ¶¶ 37-39.

In connection with Delclaux's repeated demands, AST looked more closely into Delclaux's activities under the Finder's Fee Agreement. It discovered that Delclaux's activities went beyond the scope of a "finder" (as that concept is understood in federal law), and that Delclaux had been acting as an unregistered broker-dealer in violation of United States Securities laws. Doc 81 – pgs. 10-13. This constituted a breach of the Finder's Fee Agreement, which AST terminated on January 26, 2020. *Id.* at ¶ 100.

AST then filed this lawsuit, and Delclaux counterclaimed for fees. Several months into the litigation, in April 2021, a De-SPAC transaction involving New Providence Acquisition Corp. closed. This resulted in the formation of AST SpaceMobile, Inc., which is now AST's Managing Member. AST remains a separate entity, and it received no financing from New Providence as part of the De-SPAC. Nevertheless, during summary judgment, Delclaux made a claim for additional fees purportedly owed as a result of the De-SPAC. Doc 70, pg. 8. This claim was procedurally improper (since it had never been pleaded), and

substantively untenable (for a host of reasons, including that the Finder's Fee Agreement had been long since been terminated).  Doc. 114 – pg. 10, n.5.

The District Court granted summary judgment in AST's favor on the Amended Counterclaim.  Doc 136 – pg. 2.  The Parties' then settled AST claim, and this appeal followed.

## III.  STANDARD OF REVIEW

This Court reviews Delclaux's challenges to jurisdiction and to summary judgment *de novo*. *See Payne v. J.B. Hunt Transp., Inc.*, 709 F. App'x 647, 648 (11th Cir. 2017); *Peebles v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 431 F.3d 1320, 1324 (11th Cir. 2005).  An order of summary judgment is appropriate where there is no genuine issue of material fact.  Fed. R. Civ. P. 56.  "[T]he mere existence of some alleged factual dispute," or "a mere 'scintilla' of evidence supporting the opposing party's position will not suffice." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986); *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## SUMMARY OF ARGUMENT

This case is nothing more than an attempt by Delclaux to obtain a windfall.  Delclaux's Amended Counterclaim seeks fees from AST for four different financing transactions that were part of AST's Series B round.  There is nothing in the record showing Delclaux did anything of value or significance that related to or contributed to AST's Series B.  Delclaux does not dispute this.  Instead, Delclaux has demanded

fees based on an overly simplistic and unwarranted interpretation of a contract to which it is a stranger.  Delclaux's entire case turns on the meaning, scope, and operation of so-called "Tail Provisions" in the LionTree Agreement.  Delclaux is not a party to the LionTree Agreement, and had no hand in its drafting or negotiation.  Delclaux has a separate contract with AST – the "Finder's Fee Agreement" – entered in June 2018.  While Delclaux sued under the Finder's Fee Agreement, the fees it has sought are wholly contingent upon fees being payable to LionTree under the LionTree Agreement.  If LionTree has no right to fees from AST, then neither does Delclaux.

The evidence in the record is that no fees have been paid to LionTree and that no right to fees has been established.  Doc 72 – pg. 7, ¶ 48.  Despite nearly four years of litigation, LionTree has not sought to join this lawsuit, and has not initiated any other legal proceedings to assert a purported right to fees.  *Id.* at pg. 6, ¶ 40.  In fact, it never even sent AST an invoice.  *Id.*  Based on this undisputed evidence, the District Court concluded that fees have not "become payable" to LionTree.  Doc 114 – pg. 11.  Because this is a condition precedent to any right Delclaux might have to recover fees under the Finder's Fee Agreement, summary judgment was correctly entered in AST's favor.

Summary judgment was also correctly entered in AST's favor for the **separate and independent reason** that there is no evidence in the record to support

Delclaux's interpretation of the LionTree Agreement. *Id.* at pg. 14. The LionTree Agreement has two Tail Provisions that were heavily negotiated. Doc 72 – pg. 4-6. Like typical investment banking contracts, the Tail Provisions were designed to protect LionTree from getting "cut out" and losing fees for transactions that were in the works during the bank's term of exclusivity or that came to fruition after the exclusive term but were based on work done during the term. *Id.* at pg. 4, ¶ 26.

None of the four Series B transactions were started during the term of the LionTree Agreement and none of them were based on any work that was performed by LionTree or AST during that term. *Id.* at pgs. 7-10. Delclaux has argued that this should not matter, and that LionTree should still be entitled to fees (and, derivatively, so should Delclaux). To make this argument, Delclaux's offers a self-serving interpretation of the Tail Provisions that conflicts with all of the undisputed evidence in the record. Doc 114 – pg. 15, n. 10.

The record is replete with evidence showing the meaning, scope, and operation of the Tail Provisions. Doc 70 – pgs. 7-10. AST has undisputed and uncontradicted evidence detailing the negotiations of the Tail Provisions and explaining how the parties understood them and intended for them to operate. *Id.* Delclaux has nothing but its own reading of the LionTree Agreement to counter. Doc 114 -pg. 14-15, n. 9-10. As a non-party, however, Delclaux's interpretation is irrelevant. Furthermore, AST submitted undisputed and uncontradicted evidence

from an industry expert explaining how the construction of the Tail Provisions advanced by Delclaux conflicts with established custom and practice in the industry. *Id.* at pg. 14. Delclaux had no counter expert, did not submit any rebuttal expert report, and did not even depose AST's expert in an effort to test or challenge his opinions. *Id.* at pg. 15. Finally, the record includes undisputed and uncontradicted Declarations from all four of AST's Series B investors, which, coupled with AST's own Declaration, conclusively demonstrate that, as a factual matter, the Tail Provisions were not triggered by the Series B financings. *Id.*

Without evidence to support the Amended Counterclaim or rebut the District Court's entry of summary judgment, Delclaux has seized upon a supposed question concerning federal subject matter jurisdiction. In an earlier, premature appeal, this Court, *sua sponte*, posed jurisdictional questions to the Parties about the appeal's timeliness and whether diversity jurisdiction was proper. Before AST could submit a response explaining that diversity jurisdiction was irrelevant, Delclaux dismissed that appeal. Delclaux then made a post-judgment jurisdictional challenge to the District Court. Delclaux now argues that "AST pivoted it[s] strategy" in response to this post-judgment challenge, and somehow "convinced the district court to find federal question jurisdiction here." Appellant's Brief, pg. 33. That is inaccurate. Federal question jurisdiction was clearly and directly pleaded in AST's Complaint. Doc. 1 – pg. 3, ¶ 12. AST's claim was that Delclaux breached the Finder's Fee

Agreement by acting beyond the scope of a "finder" under federal law, and, therefore, violated United States Securities laws for failing to register as a broker-dealer with the SEC, and failing to obtain membership with FINRA. *Id.* at pg. 9, ¶ 52. The District Court correctly concluded that the adjudication of this claim necessarily required the resolution of substantial questions of federal law. Doc 162 – pg. 6. The District Court also determined that because this claim concerned the enforcement of duties under the Exchange Act, it also had exclusive jurisdiction under 15 U.S.C. § 78aa(a). *Id.* at pg. 8.

Without any jurisdictional defect, and without any record evidence to support its position on the merits, Delclaux is without any way to obtain reversal of the District Court's entry of judgment in AST's favor. That judgment should be affirmed.

# ARGUMENT

## I. SUBJECT MATTER JURISDICTION WAS DIRECTLY PLEADED IN THE COMPLAINT, WAS ACKNOWLEDGED BY ALL PARTIES DURING THE CASE, AND WAS CORRECTLY AFFIRMED BY THE DISTRICT COURT IN RESPONSE TO DELCLAUX'S AFTER-THE-FACT CHALLENGE

It is well established that federal jurisdiction exists wherever "the right to relief depends upon the construction or application of the Constitution or laws of the United States." *Smith v Kansas City Title & Tr. Co.*, 255 U.S. 180, 199 (1921). That is the situation here. Federal question jurisdiction was expressly asserted in AST's Complaint, where it alleged that "this action arises under the laws of the United States insofar as it necessitates the resolution of disputed and substantial federal issues under United States Securities Laws." Doc 1 – pg. 3, ¶ 12. The District Court affirmed its jurisdiction at the outset of the case, and the Parties litigated for two and half years without any challenge or concern raised with respect to jurisdiction. Only **after** the District Court entered final judgment in favor of AST did Delclaux claim that federal jurisdiction was lacking. In denying Delclaux's motion to vacate, the District Court articulated the bases for federal jurisdiction under 28 U.S.C § 1331 and 15 U.S.C. § 78aa(a). Doc 162 – pgs. 6-9. On appeal, Delclaux simply restates the deficient arguments already raised before the District Court. There is nothing new. Accordingly, for the reasons stated by the District Court, and for the reasons

set forth herein, Delclaux's challenge to the District Court's exercise of subject matter jurisdiction should be rejected.

### A. The District Court Had Federal Question Jurisdiction Under 28 U.S.C. § 1331

Subject matter jurisdiction is vested in federal courts over all civil actions arising under the Constitutions, law, or treaties of the United States. 28 U.S.C. § 1331. If a cause of action is created by federal law or if the plaintiff's right to relief necessarily depends on the resolution of a substantial question of federal law, the cases "arises under" federal law for purposes of jurisdiction. *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 689-90 (2006). In this case, the District Court properly exercised subject matter jurisdiction under 28 U.S.C. § 1331 because federal issues were (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress. *See Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005)); *see also* Doc 162 – pg. 6.

Pursuant to the well-pleaded complaint rule, jurisdiction depends on how the claim is set forth in the operative pleading. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). A review of AST's Complaint demonstrates that its claim against Delclaux clearly and unequivocally turns on federal law. Indeed, the centrality of federal law is reflected in the very first

allegation, where AST states that "[i]n breach of contract and in violation of United States Securities Laws, Defendant Delclaux acted in the capacity of a broker-dealer without the requisite registrations and licensures." Doc 1 – pg. 1, ¶1.

The Complaint asserted jurisdiction under 28 U.S.C. § 1331 because the action "necessitates the resolution of disputed and substantial federal issues under United States Securities Laws." Doc 1 – pg. 3, ¶ 12. The Complaint explains that AST contracted with Delclaux to serve as a "finder" in connection with its Series A and B financing rounds. *Id.* at pg. 1, ¶ 2. The very concept of a "finder" is a concept derived from federal law—an uncodified exception to the registration and licensure requirements imposed by the federal Exchange Act and FINRA rules. Doc 82-1 - pgs. 8-9. The Complaint alleges that Delclaux was required to stay within the scope of the "finder exception," but despite this restriction, it acted beyond this scope, such that its role became that of a broker-dealer under federal law. Doc 1 – pgs. 7-8, ¶¶ 39-41. The Complaint discusses the registration and licensure requirements imposed by federal law under 15 U.S.C. § 78o(a)(1), and the prohibitions under FINRA Rule 2040 against receipt of transaction-based compensation for unregistered brokers. *Id.* at pgs. 5-6, ¶ 26. AST's claim was that, despite representing that it would have and maintain all necessary licenses and registrations needed to provide services on behalf of AST, Delclaux acted as a broker-dealer, but violated federal law by not registering with the SEC and by not becoming a member of FINRA, thereby breaching the

parties' contract. In order to adjudicate AST's claim, it was necessary to resolve substantial questions of federal securities laws. Hence, subject matter jurisdiction under 28 U.S.C. § 1331 was proper. *See, e.g., NASDAQ OMX Group, Inc. v. UBS Securities, LLC*, 770 F.3d 1010, 1018-31 (2d Cir. 2014) (state law claims, including breach of contract, turned on federal law duty for NASDAQ to operate a fair and orderly exchange, hence, jurisdiction was proper under *Gunn-Grable* test); *D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93, 99-104 (2d Cir. 2001) (upholding subject matter jurisdiction over state law claims where resolving case "requires a court to construe federal securities laws and evaluate the scope of the NYSE's duties, as defined under the Exchange Act and the regulations and rules thereto…").

### 1. Federal Issues were Necessarily Raised

Federal issues were necessarily raised by AST's Complaint. AST's claim was for breach of the Finder's Fee Agreement, which called for Delclaux to "assist AST and AST's investment banker with efforts relating to the Financings, but [provided that Delclaux] was not to 'perform any act in connection with the Agreement, which (i) would require Finder to be registered as an investment advisor or broker-dealer or (ii) is in violation of any state or federal securities laws in the United States of America or any other relevant securities laws in other jurisdictions.'" Doc 1 – pgs. 4-5, ¶ 23 (quoting Agreement). The Complaint alleges that Delclaux "expressly

covenanted, represented and warranted to AST that, whatever work was performed under the [Finder's Fee] Agreement, it would have and would maintain 'all licenses permits and other authorizations required by applicable laws, rules or regulations…' [and]…that it would 'conduct its activities in connection with its engagement…in compliance with all applicable securities and other laws, rules and regulations.'" *Id.* at pg. 5, ¶ 25 (quoting Agreement).

The Complaint sets forth the registration requirements and prohibitions in Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1), and under FINRA Rule 2040. *Id.* at pgs. 4-5, ¶ 26. The Complaint goes on to allege that a year and half after entering the Finder's Fee Agreement and paying Delclaux for work associated with its Series A financing round, AST discovered that Delclaux's activities and payment structure constituted the work of a broker-dealer requiring licenses and registrations under United States law. *Id.* at pg. 7, ¶ 39. AST alleged that "[d]espite the representations and covenants in the Agreement that all necessary licenses and registrations would be in place and maintained, AST discovered that Delclaux was not registered with the United States Securities & Exchange Commission ('SEC') and was not licensed with or a member of FINRA." *Id.* at pg. 8, ¶ 42.

"Accordingly, by letter dated January 26, 2020, AST formally terminated the Agreement with Delclaux, notified Delclaux of its breach, demanded a return of all confidential information as required under the Agreement, and once again rejected

Delclaux's persistent demands for additional payment." *Id.* at ¶ 43. When Delclaux refused to return monies paid, refused to return any confidential information, persisted in demanding additional payment, and began harassing AST, this lawsuit was filed. *Id.* at pgs. 8-9, ¶¶ 44-48.

To adjudicate this lawsuit, it was necessary to assess and apply the registration and membership requirements under federal securities laws and the rules of the SEC and FINRA. It was necessary to determine whether Delclaux was acting as a broker-dealer under federal law. *See* Doc 162 – pgs. 6-7. And it was necessary to delineate the boundaries of the "finder exception" to determine if Delclaux was somehow exempt from otherwise applicable registration and membership requirements. *Id.* at pg. 7. If the finder exception was construed broadly enough such that Delclaux did not violate federal law by failing to register as a broker-dealer, then Delclaux did not breach the representations and warranties in the Finder's Fee Agreement. That is an inquiry into federal law, and it was at the heart of AST's case. *Id.* at pg. 8.

Delclaux seeks to downplay the centrality of federal law, arguing that federal law is "peripheral" and only "indirectly alluded" to in the Complaint. Appellant's Brief, pgs. 40, 42. This cannot be squared with the actual allegations. Indeed, as the District Court stated, "the Complaint goes well beyond that." Delclaux's other argument is to say that federal issues were not necessary because AST raised a number of different breaches, two of which "are entirely agnostic to any federal

law…" *Id.* at pg. 32. Specifically, Delclaux contends that AST alleged Delclaux breached by (i) "engaging in activity that exceeded the agreed upon scope of its activities under the [Finder's Fee] Agreement," and (ii) "refusing to return confidential information obtained from AST under the [Finder's Fee] Agreement." *Id.* at pgs. 24, 38-39. This argument fails for several different reasons.

First, the allegation about Delclaux engaging in activity that exceeded the agreed upon scope of its activities under the Parties' contract is simply an allegation that Delclaux acted beyond the scope of a "finder." As stated, the very concept of a "finder" is derived from federal law, hence, applying and construing federal law would have been necessary to determine if Delclaux acted outside of its permitted scope.

Second, the allegation that Delclaux refused to return confidential information is derivative of its violation of federal law, and, more importantly, is a separate claim for breach that would not resolve the other breaches alleged by AST. The Complaint is clear that AST only terminated the Parties' contract and demanded the return of confidential information ***after*** it discovered that Delclaux had failed to register with the SEC and obtain membership in FINRA. Doc 1 – pg. 8, ¶ 43. The breach of contract based on Delclaux's violation of federal law had occurred ***before*** the return of confidential information was even requested. While Delclaux's failure to return

confidential information was yet another breach, resolving that claim would in no way resolve AST's case.[1]

Third, there is no authority that **every claim** in a complaint must require the application of federal law for jurisdiction to be proper under 28 U.S.C. § 1331. As long as one claim requires the application of federal law, jurisdiction is established. *Norris v. Brady*¸ 2023 WL 2768412, at *5 (S.D. Fla. Apr. 4, 2023); *Roman v. Hooters Spring Hill, Inc*., 816CV01332T24MAP, 2016 WL 8997452, at *2 (M.D. Fla. July 8, 2016); *Bruan, Gordon & Co. v. Hellmers*, 502 F. Supp. 897, 901 (S.D.N.Y. 1980) ("federal jurisdiction is proper where a complaint is based **in part** on federal statutes or federal legal principles.") (emphasis added).

Fourth, and finally, the presence of any additional claims of breach of contract that do not turn on federal law did not divest the District Court of jurisdiction under 28 U.S.C. § 1331. The District Court could have either jettisoned those claims or kept them, as it did, pursuant to its power to exercise supplemental jurisdiction under 28 U.S.C. § 1367.

---

[1] Delclaux cites *Mobil Oil Corp. v. Coastal Petroleum Co.*, 671 F.2d 419, 422 (11th Cir. 1982) and *Davis v. Eagle Oil & Gas Co.*, No. 08-CA-107, 2008 WL 11334171, at *4 (W.D. Tex. Oct. 10, 2008) in support of its argument. Appellant's Brief, pg. 27. Both *Mobil* and *Davis* were situations were all claims could be resolved without regard to federal law. In contrast, even if AST could succeed without federal law on its claim for breach based on Delclaux's refusal to return confidential information, the lawsuit would not be resolved.

Delclaux's arguments as to the first prong are unavailing. As the District Court correctly pronounced: "[t]here is no question that a federal issue was necessarily raised in this action." Doc 162 – pg. 7.

## 2. Federal Issues were Actually Disputed

There is also no question that federal issues were actually disputed. Delclaux's Amended Answer denied all allegations asserted by AST that it acted beyond the scope of a finder and that it breached the Parties' contract by failing to register with the SEC and obtain FINRA membership. Doc 17 – pgs. 1, 5, ¶¶ 4, 42-43, 52. Throughout the case, moreover, Delclaux rejected AST's conception of the finder exception and its position as to the registration requirements imposed by federal law. Delclaux challenged the articulation of those federal issues as advanced by one of AST's experts, and sought to exclude his testimony. *See* Doc 69. Delclaux even moved for summary judgment on the basis that it purportedly acted within the bounds of the finder exception, and that it did not require registration as a broker-dealer. Doc 70 – pg. 15 (arguing that "AST's claim…should be dismissed…because Delclaux at all times worked only as a finder who was not required to be registered under the ***United States Securities Laws***."); *id.* (citing ***federal case law*** and contending that "[t]he law is clear that a finder is entitled to [a] percentage of transaction fees even if not registered with FINRA as long as the finder does not provide investment banking services and is strictly a finder.").

### 3. Federal Issues were Substantial

These disputed federal issues were substantial and important to the federal system as a whole. Pursuant to Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1)), it is unlawful "to induce or attempt to induce the purchase or sale of, any security…unless such a broker or dealer is registered [with the SEC]." Moreover, unless the person or entity is exempt, it must register with a "self-regulatory organization;" if a broker-dealer effects securities transactions other than on a national securities exchange of which it is a member, it must become a member of FINRA, unless qualifying for an exemption. 15 U.S.C. § 78o(b)(8); 17 CFR § 240.15b9-1.

An exception to these federal registration rules is when a person or entity acts only as a "finder." The concept of a finder—distinct from a broker or dealer and not requiring registration with the SEC—is not codified or otherwise set forth in the regulations. Doc 82-1 – pgs. 8-13. Rather, it has arisen largely through inference, based on SEC "No Action Letters," through which the SEC provides guidance on whether certain factual circumstances would violate applicable securities laws and result in enforcement actions. *Id.; see also Cornhusker Energy Lexington, LLC v. Prospect St. Ventures,* No. 8:04CV586, 2006 WL 2620985, at *6 (D. Neb. Sept. 12, 2006) ("In a series of no-action letters, the staff of the [SEC] . . . has indicated that in certain limited circumstances, a person or entity may perform a narrow scope of

activities without triggering b[r]oker/dealer registration requirements.").

The contours of the finder exception, the particular circumstances that require SEC registration and FINRA membership, and the ability for unregistered persons or entities to receive transaction-based compensation are substantial issues of federal law that were all raised by AST's Complaint. *See* Doc 1 – pg. 5, ¶ 26. These issues are still being developed and crystalized by federal courts and regulators, and are frequently discussed by the securities and regulatory enforcement bar.[2] *See SEC v. Sky Group USA, LLC, et al.,* SEC Docket No. 21-cv-23443 (Sept. 27, 2021) (SEC action against unregistered persons participating in capital raising); *see also SEC v. Richard Eden, et al.,* SEC Docket No. 22-cv-04833 (July 14, 2022) (SEC alleging violations of federal securities laws by engaging in conduct that required registration as a qualified broker-dealer). In fact, a formal exemption to federal registration requirements for "finders" was proposed by the most recent SEC Chairman, but was not ultimately adopted.[3]

The federal issues raised in this lawsuit were complex, evolving, and

---

[2] *See, e.g.,* The SEC Remaining in Search of and Is Looking for Finders, KATTEN.COM, https://katten.com/the-sec-remains-in-search-of-and-is-looking-for-finders (last visited May 21, 2024) [hereinafter "Katten Article"]; Finder and Unregistered Broker-Dealers: Understanding the Risks, Hosted by Strafford, https://www.klgates.com/Finders-and-Unregistered-Broker-Dealers-Understanding-the-Risks-hosted-by-Strafford-6-22-2021 (last visited May 21, 2024).

[3] *See* Katten Article.

substantial.  Analyzing, construing, applying, and resolving these federal law questions was far from a rote "binary assessment of whether Delclaux complied with federal law or not."  Appellant's Brief, pg. 29.  As the District Court reasoned:

> [W]hether Declaux violated federal securities law would not be a simply binary assessment as Delclaux suggests in its Motion.  Rather, it would require an analysis and interpretation of a body of federal case law.  Furthermore, the Court's determination of whether Delclaux acted beyond the scope of a finder would add to the development and clarification of federal law around the finder's exception.  Thus, the substantiality requirement under the third prong is met.

In addition to the complexity of these federal issues, they are substantial insofar as the federal government has a strong interest in having federal courts adjudicate them.  Congress has granted exclusive jurisdiction of all suits in equity and actions at law brought to enforce any liability or duty created by the Exchange Act or the rules or regulations thereunder.  15 U.S.C. § 78aa(a); *see* Doc 162 – pgs. 8-9.  Furthermore, the regulation of the sale of securities in United States and of companies formed in the United States is of great importance to the federal government.  *Empire Fin. Group, Inc. v. Fin. Indus. Regulatory Auth., Inc*., 08-80534-CIV, 2009 WL 10644856, at *3–4 (S.D. Fla. Jan. 15, 2009); *see also Turbeville v. Dep't of Fin. Services*, 248 So. 3d 194, 198 (Fla. 1st DCA 2018) ("Interpretation of FINRA's rules is exclusively a federal question").  When litigation involves issues that bear upon such regulation, the issues are substantial and federal jurisdiction is appropriately exercised.  *See e.g., D'Alessio*, 258 F.3d at

100 (interpretation and application of federal securities laws are "areas of undisputed strong federal interest").

### 4. The Federal State Balance was Not Disturbed

Finally, by exercising federal jurisdiction over this case, the District Court in no way upset the federal-state balance approved by Congress. As stated, Congress itself called for exclusive federal jurisdiction over cases involving the enforcement of rules and regulations under the Exchange Act. Allocating cases such as this to the federal courts, moreover, would not result in a wave of new cases flooding into them. These particular federal issues—involving the interplay between registration requirements and the finder exception—are not ubiquitous. In fact, the majority of cases implicating the finder exception and the enforcement of registration rules are cases that are already being brought in federal courts directly by the SEC. *See, e.g., SEC v. Richard Eden, et al.*, SEC Docket No. 22-cv-04833 (July 14, 2022); *SEC v. Sky Group USA, LLC, et al.*, SEC Docket No. 21-cv-23443 (Sept. 27, 2021); *SEC v. Spartan Securities Group, LTD*, Case No. 8:19-cv-448-T-33CPT, 2020 WL 7024884 (M.D. Fla. Nov. 30, 2020); *SEC v. Bankatlantic Bancorp, Inc*., Case No. 12-60082-civ-Scola/Otazo-Reyes, 2013 WL 12009694 (S.D. Fla. Nov. 14, 2013); *Brumberg, Mackey & Wall, P.L.C.*, SEC No–Action Letter, 2010 WL 1976174 (May 17, 2010). Having a federal court decide whether Delclaux acted in the capacity of a broker-dealer without the requisite registrations and licensures would not

"disturb[] any congressionally approved balance of federal and state judicial responsibilities." *See e.g.*, *Norris*, 1:23-CV-20439-KMM, 2023 WL 2768412, at *4 (having federal court decide whether accounts are securities that need to be registered with the SEC did not disturb the any balance of federal and state judicial responsibilities).

### B. The District Court Had Exclusive Jurisdiction Under 15 U.S.C. § 78aa(a)

For all of those reasons, the District Court correctly exercised federal jurisdiction under 28 U.S.C. § 1331. In addition, the District Court correctly held that it also had jurisdiction under the Exchange Act. Pursuant to 15 U.S.C. § 78aa(a), federal district courts have exclusive jurisdiction "of all suits in equity and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules or regulations thereunder." *Turbeville v. FINRA*, 874 F.3d 1268, 1274 (11th Cir. 2017).

In *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374 (2016), the Supreme Court held that the standard to determine whether a state law claim is brought to enforce any liability or duty created by the Exchange Act is the same standard for determining whether a state law claim arises under federal law for purposes of 28 U.S.C. § 1331. Thus, the above analysis applies with equal force to warrant jurisdiction under 15 U.S.C. § 78aa(a). A separate discussion is justified,

however, because the present case is ***precisely the type of scenario*** that the Supreme Court referenced in explaining when Section 78aa(a) would apply to a state law claim.

In *Manning*, Merrill Lynch argued that Section 78aa(a) applied whenever a state law claim asserted a breach of a duty under the Exchange Act, even where the plaintiff could prevail on the claim without proving that an actual breach of the Exchange Act occurred. *Id*. at 381. The Supreme Court rejected that argument, finding that Section 78aa(a) "confers jurisdiction when an action is commenced in order to give effect to an Exchange Act requirement." *Id*. A "complaint that happens to mention a duty established by the Exchange Act" is not enough. *Id.* By way of example, the Court said to:

> Consider…a simple state-law action for breach of contract, in which the plaintiff alleges, for atmospheric reasons, that the defendant's conduct also violated the Exchange Act—or still less, that the defendant is a bad actor who infringed that statute on another occasion. On Merrill Lynch's view, §[78aa(a)] would cover that suit; indeed, Merrill Lynch points to just such incidental assertions as the basis for federal jurisdiction here. But that hypothetical suit is "brought to enforce" state contract law, not the Exchange Act—because the plaintiff can get all the relief he seeks just by showing the breach of an agreement, without proving any violation of federal securities law. The suit, that is, can achieve all it is supposed to even if issues involving the Exchange Act never come up.

*Id.* at 381-82 (internal citations to the record omitted).

The Supreme Court rejected what it characterized as Merrill Lynch's "expansive understanding." *Id.* at 381. But it also rejected Manning's "far more

restrictive interpretation." *Id* at 382. Manning had argued that only federal causes of action created by the Exchange Act could fall within the scope of Section 78aa(a). If a complaint brought only state created claims, even if the "success of [such] state claim[s] necessarily hinge[d] on proving that the defendant breached an Exchange Act duty," federal jurisdiction would not apply. *Id*. The Court found that Manning's position "veer[ed] too far in the opposite direction." *Id*. Where "a state-law action necessarily depends on a showing that the defendant breached the Exchange Act, then that suit could also fall within §[78aa(a)]'s compass." *Id*. at 383.

The clear import of the Court's discussion is that when a state law claim is predicated on a violation of the rules and regulations of the Exchange Act such that a plaintiff cannot "get all the relief he seeks" without proving such a violation, federal jurisdiction is required under 15 U.S.C. § 78aa(a). *See id.*; *see also id.* at 394 (Thomas, J. joined by Sotomayor, J., concurring in judgment but rejecting the need to utilize the four factor test under 28 U.S.C. § 1331, because the "language [of § 78aa(a)] establishes a straightforward test: If a complaint alleges a claim that necessarily depends on a breach of a requirement created by the [Exchange] Act, §[78aa(a)] confers exclusive federal jurisdiction over that suit.").

As discussed above, AST's contract claim necessarily depends on a breach of a requirement created by the Exchange Act. If the finder exception covered Delclaux's conduct, or if Delclaux was otherwise exempt from registering with the

SEC or becoming a member of FINRA, then there could be no breach of contract for failing to register or failing to maintain all necessary licensures. If Delclaux did not violate the federal registration requirements imposed by the Exchange Act, AST's claim would collapse. Accordingly, this case is properly construed as a case brought to enforce a duty created by the Exchange Act, falling within the exclusive jurisdiction of the federal courts under 15 U.S.C. § 78aa(a).

## II. THE TWO INDEPENDENT BASES ON WHICH THE DISTRICT COURT ENTERED SUMMARY JUDGMENT IN AST'S FAVOR WERE SOUND AND SHOULD BE AFFIRMED.

The District Court was not only correct to exercise jurisdiction over this lawsuit, it was also correct to enter summary judgment in AST's favor on Delclaux's Amended Counterclaim. The District Court's judgment rested on two independent bases: (1) that there was no evidence that Delclaux satisfied the condition precedent in the Finder's Fee Agreement, and (2) that there was no evidence supporting Delclaux's simplistic and overly expansive interpretations of the LionTree Agreement on which its Amended Counterclaim was based. The District Court's judgment should be affirmed on both grounds.

### A. There Was No Record Evidence That Fees Had "Become Payable" To LionTree—A Necessary Condition Precedent For Delclaux To Recover Fees

The fees sought by Delclaux through the Amended Counterclaim are based on Section 2(b) of the Finder's Fee Agreement, which provides for a payment to

Delclaux, called the "LTA Engagement Fee," that is contingent on payments being owed to LionTree. Doc 72 – pg. 4, ¶ 22. The original concept was for Delclaux to be paid directly by LionTree, with LionTree taking a portion of any fees paid to it by AST and giving that to Delclaux. *Id.* at pg. 2, ¶ 6. LionTree, however, was not amenable to this arrangement, so it agreed to reduce its own fees under the LionTree Agreement in an amount corresponding to the LTA Engagement Fee that was ultimately granted to Delclaux. *Id.* at ¶ 7.

The contingent nature of the LTA Engagement Fee is stated expressly in Section 2(b):

> If no amounts become due or payable to LTA in connection with a Financing and the LTA agreement is terminated, [Delclaux] will not be entitled to receive the LTA Engagement Fee.

Doc 70-3 – pg. 4, § 2b. In order to recover on the Amended Counterclaim, therefore, Delclaux needed to submit evidence demonstrating that amounts had "become due or payable" to LionTree in connection with AST's Series B financings.

Fees only "become payable" to LionTree if AST has a legally enforceable obligation to pay such fees. "A sum of money is said to be payable when a person is under an obligation to pay it." Black's Law Dictionary 1128 (6th ed. 1990). Courts construing the "become payable" term in other contexts have equated it with "legally due and owing," and have noted the term "requires certainty, not mere probability." *See In re Ripley*, 926 F.2d 440, 444 (5th Cir. 1991) ("become payable"

under Bankruptcy Code means legally enforceable obligation, similar to meaning of term in law of commercial paper); *In re Pennetta*, 19 B.R. 794, 796 (Bankr. D. Colo. 1982) ("become payable" equated with tax phrase "legally due and owing").

In order for Delclaux to satisfy the condition precedent to its Amended Counterclaim, there must be more than evidence of a hypothetical contractual right belonging to LionTree that might one day be asserted. Rather, there must be evidence that LionTree has established a right to fees. A fee is not "payable" or "due" to LionTree simply because Delclaux says it is.

The evidence shows that, before this lawsuit, Delclaux recognized the contingent nature of the fee arrangement and attempted to change the Finder's Fee Agreement to avoid it. Specifically, by way of e-mail on August 30, 2019, Delclaux wrote to AST proposing an amendment to the Finder's Fee Agreement. Doc 72 – pg. 3, ¶ 17. Recognizing that its right to fees depended on LionTree establishing its own right to fees, Delclaux appealed to the "special circumstances and close relation" between it and AST, proposing that "in case [LionTree] should decide to waive their fee or reduce the amount I believe we should continue to be entitled and receive payment of our share regardless of what they decide to do." *Id.* Delclaux admitted at its deposition that this proposal to was change the Finder's Fee Agreement "so that in the event no money is paid to LionTree, Delclaux Partners would still be entitled to payment". Doc 72-10 – pg. 65, 256:11-22. The Finder's

Fee Agreement was ultimately amended, but, as Delclaux admitted, that amendment did not "cover[] the proposal [Delclaux] made about [it] getting paid even if LionTree is not paid anything[.]" *Id.* at 255:13-20.

In granting summary judgment in AST's favor, the District Court concluded that there was an "absence of any record evidence that fees are due and payable to LionTree under the Tail Provisions, [hence] AST is entitled to judgment as a matter of law ..." Doc 114 – pg. 11. Indeed, far from establishing any right to fees, LionTree has not even sent an invoice for fees connected with the Series B (despite its past practice of invoicing AST during the Series A round), it did not seek to join the litigation as it proceeded through the District Court (despite being forced to participate in discovery), and it has not initiated any independent lawsuit in an effort to obtain fees from AST. As a result, the District Court correctly concluded that the condition precedent necessary for Delclaux to recover the LTA Engagement Fee was not satisfied.

### B. All Of The Record Evidence Supported AST's Construction Of The Tail Provisions, And The Undisputed Facts Demonstrated That No Fees Were Owed

The District Court held that Delclaux's failure to provide evidence showing that the condition precedent in the Finder's Fee Agreement had been satisfied was "dispositive" as to the Amended Counterclaim. *Id.* However, "for the sake of completeness," the District Court went on to rule that AST was also entitled to

summary judgment for the separate and independent reason that the undisputed record evidence demonstrated that no fees were owed under the LionTree Agreement, and, therefore, no contingent fees were owed to Delclaux. *Id.* at pgs. 10-11.

Delclaux's argument that fees are owed under the LionTree Agreement rests on a strained and unsupported interpretation of the Tail Provisions. Delclaux argues that the Tail Provisions are unambiguous and mean exactly with it says they mean. Delclaux, of course, is not a party to the LionTree Agreement and had no involvement in its drafting or negotiation. Doc 72 – pg. 2, ¶ 5. Delclaux's personal opinion about the meaning of the Tail Provisions is irrelevant. *See Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, No. 14-CV-04394, 2016 U.S. Dist. LEXIS 120131, at *42 n.11 (S.D.N.Y. Aug. 31, 2016); *MBL Contr. Corp. v. King World Prods., Inc.*, 98 F. Supp. 2d 492, 497 (S.D.N.Y. 2000). It is also completely contradicted by the evidence in the record. When the record evidence is considered, it is clear that none of the four Series B transactions triggered a right to fees under the First or Second Tail.

### *The First Tail Provision*

The Tail Provisions are contained in Section II of the LionTree Agreement, and come into play after the Term of the LionTree Agreement ends. The First Tail

Provision covers the time-period from the end of the Term through the next 180 days. It provides as follows:

> If at anytime prior to 180 days following the end of the Term, [AST] enters into an agreement with any third party that subsequently results in a Transaction, or a Transaction is consummated, then [AST] will pay LionTree the applicable Fee(s)…

Doc 70-4 – pg. 4. It is undisputed that AST did not "consummate" any Transaction during the First Tail Period. *See* Doc 72 – pgs. 4, ¶¶ 24-25. The only disputed issue is whether AST entered into any agreements with third parties during the First Tail Period that subsequently resulted in Transactions. To resolve that issue, it was necessary for the District Court to determine what type of "agreement" is covered.

The contract language itself does not specify. Delclaux contends that "agreement" means any contract, no matter its purpose or nature, including non-disclosure agreements ("NDAs"). With respect to AST's four Series B investors, Delclaux argues that each entered into NDAs with AST during the First Tail Period in order to explore a potential investment and conduct due diligence. Thus, Delclaux reasons that these NDAs subsequently resulted in Transactions entitling LionTree to fees.

While Delclaux's reading ignores the purpose of Tail Provisions in the investment banking context, it is not implausible based on the contractual language alone. However, the notion that the First Tail **must** be construed to encompass NDAs and that there are **no other plausible interpretations** of the relevant language

is simply a bridge too far. AST's position, for example, is that the key clause only applies to legally binding agreements that set forth the essential terms of a transaction, requiring a transaction to be consummated pending completion of specified closing conditions. In other words, "an agreement…that subsequently results in a Transaction" means a binding term sheet or a final purchase and sale agreement where closing is scheduled for some time after signing.

The primary purpose of this type of agreement is for a transaction to result, and, once executed, a transaction typically does result. NDAs, on the other hand, have a different purpose and result. The chief purpose of an NDA is to protect confidentiality. Doc 81 – pg. 10, ¶ 76. It is designed to allow parties to speak freely. While a transaction might be explored or evaluated after executing an NDA, it does not subsequently result from one. *Id.* at ¶ 77. Indeed, the record evidence showed that AST entered hundreds of NDAs with potential business, technical, or investment partners that never subsequently resulted in transactions. *Id.* at ¶ 75.

On its face, AST's reading of the First Tail is also plausible and consistent with the contractual language. When there is more than one plausible interpretation of a contract, the contract is ambiguous. *Giles v. City of New York*, 41 F. Supp. 2d 306, 316 (S.D.N.Y. 1999).[4] And where ambiguity exists, the court must look to extrinsic evidence to properly construe it. *Id.* The court's job is to review the

---

[4] New York law governs the LionTree Agreement.

extrinsic evidence in an effort to determine the contract's true meaning—what did the parties to that contract actually intend, and what was their "meeting of the minds." *See Compagnie Financiere de CIC et de l'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). With respect to each of the Tail Provisions, Delclaux's case crumbles as soon as extrinsic evidence is considered.

The undisputed record evidence is that the clause concerning an "'any agreement with any third party that subsequently results in a Transaction' was meant to cover circumstances where AST and an investor entered into a legally binding agreement for the sale or issuance of securities of the Company, but where the financing transaction closed on a later date, outside of the first Tail period." Doc 72-2 – pg. 6, ¶ 25. Mr. Severson, AST's former CFO, explains:

> In my experience, while certain financial transactions sign and close on the same day, it is common for a transaction to "sign" – *i.e.*, the Parties enter into a legally binding contract setting forth the terms and conditions of a sale of equity or the like – but then "close" at a later date following the completing of certain "closing conditions," after which funds are wired and the actual transfer of securities is made.

*Id.* at pg. 7. With that in view, the "first Tail period was designed to capture both Transactions that closed during the first Tail period, and Transactions that signed during that period, but closed after the period ended." Accordingly, the term 'agreement' means only definitive contracts between an investor and AST." *Id.* at ¶ 26.)

This understanding and intent is consistent with industry standards. The undisputed Expert Report of Jim Timmins – a 40-year industry veteran with expertise in private placement fundraising and merger and acquisitions – details the respective roles of investment bankers and issuers in private placement fundraising, and the operation and purpose of "tail periods" which are standard in the industry. Doc 72-8 – pgs. 11-3. With respect to the First Tail Provision, Mr. Timmins confirms that:

> Pursuant to industry standards and established custom and practice, a tail provision of this kind would only be triggered by an investment transaction that closed or by the execution of a binding contract setting forth the terms and conditions of an investment transaction,
>
> including, at a minimum, purchase price, number of shares, projected closing date, and other standard provisions of such an investment in an emerging growth company.

*Id.* at pgs. 9-10. Mr. Timmins states that the clause pertaining to "an agreement that subsequently results in a Transaction," "contemplates something more than a mere clerical requirement…, and instead is focused on the sort of document that conveys the intention of a counterparty to proceed with a transaction – not just a review of an investment opportunity." *Id.* at pgs. 18-19, ¶ 54. "This makes sense," explains Mr. Timmins, "in that it is congruent with the purpose underlying tail provisions to protect an investment bank from being 'cut out' of a process and blocked from receiving fees on a transaction that is already in the works and moving toward

consummation of the transaction during the investment bank's exclusive term." *Id.* at pg. 19, ¶ 55.

As for Delclaux's proposed interpretation – that the First Tail's reference to "agreement" covers any type of contract, including the mere signing of an NDA – the extrinsic evidence is uniformly opposed. With respect to the parties' intent, the undisputed evidence directly forecloses Delclaux's interpretation:

> There was no intent by AST or mutual understanding between the parties to the LionTree Agreement that the first Tail period could be triggered simply by entering a non-disclosure agreement. No one at LionTree ever indicated such an intent during negotiations of the Tail, and no one at LionTree has ever indicated such an intent since the LionTree Agreement was finalized and signed.

Doc 72-2 – pgs. 7-8, ¶ 27. Likewise, Mr. Timmins states that Delclaux's position "is wholly inconsistent with industry standards and practice," (Doc 72-8 – pg. 9-10, ¶ 21(a)) "astonishing on its face," (*Id.* at pg. 18, ¶ 53) and a position he has "never seen anyone take" in his 40 years of experience. *Id.* at ¶ 54. Mr. Timmins explains:

> An NDA is almost always executed at the beginning of [the private placement fundraising] process, as a purely clerical or administrative step, prior to diligence or negotiations regarding the terms of an investment. Tail provisions are not intended to give an investment bank a windfall, entitling them to fees on transactions that were non-existent during the exclusive term of engagement. The purpose is to protect the investment bank with respect to transactions that were already underway, even if preliminarily, during the term, but do not close until after the term ends. Therefore, when a tail references an 'agreement' in addition to a closing, it means a contract which closely precedes a closing and which sets forth at least some (in not all) of the terms and conditions of that closing…Delclaux's argument would mean that the first tail could cover transactions where absolutely no part of the

process with the investor had commenced until after the term ended. That would not be protecting the investment bank for the work that occurred during its period of exclusivity – it would entitle the investment bank to a fee for something it had nothing to do with and that would be inconsistent with industry standards.

*Id.* at pg. 19, ¶ 56.

There is no dispute that the First Tail ended on September 10, 2019. Doc 72 – pg. 4, ¶ 24. The undisputed evidence shows all four of the Series B investments closed after that date. *Id.* at ¶¶ 50, 57, 64, 70. In addition, sworn and undisputed Declarations from each of the Series B investors and AST confirm that no legally binding agreements for the purchase of AST's securities were entered into prior to the end of the First Tail. *Id.* at ¶¶ 51, 58, 65, 71. Delclaux's entire case with respect to the First Tail is based on evidence that AST entered into NDAs with each of its investors during the covered period. The District Court found that "Delclaux fail[ed] to support with record evidence its contentions that the First Tail specifically contemplated the execution of non-disclosure agreements…" Doc 114 – pg. 12. To the contrary, the District Court held that the "evidence supporting [AST's] interpretation of the Tail Provisions is undisputed." *Id.* at pg. 16. Accordingly, summary judgment was correctly entered in AST's favor with respect to Delclaux's claim for fees under the First Tail.

## *The Second Tail Provision*

The Second Tail covers the time-period starting from 180 days after the Term until the expiration of 12 months.  Doc 72 – pg. 4, ¶ 23.  It states:

> If, at any time on or after 180 days from the end of the Term and prior to the expiration of 12 months following the end of the Term, [AST] enters into an agreement with a third party that was introduced by [AST] or LionTree, or where contact was developed or pursued by [AST] or LionTree, during the Term of the Agreement and that subsequently results in a Transaction, or a Transaction is consummated with this third party, then [AST] will pay LionTree the applicable Fee(s)…

Doc 70-4 – pg. 4.  It is undisputed that all four of AST's Series B transactions closed within the covered period.  Accordingly, the relevant issues are whether those Transactions were with investors who were introduced to AST during the Term or where contact with those investors was developed or pursued during the Term, and whether any such interactions were in any way connected with the subsequent Transactions.  What constitutes an "introduction," what type of "contact" must be "developed or pursued," what that development or pursuit must entail, and how, if at all, that work must causally relate to a subsequent Transaction are questions that the operative language does not answer.

Delclaux's interpretation is, once again, overly simplistic and incredibly expansive.  Delclaux argues that if AST or LionTree did any activity concerning an investor – including just identifying them as a target and doing preliminary market research – then any subsequent Transaction with that investor would be covered by

the Second Tail, regardless of whether the prior work had any relevance or causal connection with the later Transaction. AST's interpretation is that an introduction requires a direct meeting with the investor. With respect to the development and pursuit of contact, AST's interpretation is that this encompasses work done during the Term to advance discussions with investors to whom AST was introduced by third parties or who had already been introduced prior to the Term. In all cases, the efforts had to causally contribute to a Transaction subsequently closing.

To determine the meaning, scope, and operation of the Second Tail Provision, the District Court needed to consider extrinsic evidence. Once again, this evidence was undisputed and uniformly supported AST's interpretation. Much of the language in the Second Tail was proposed by Mr. Severson. His undisputed testimony is that:

> AST understood and intended that it would cover only those Transactions where the work of LionTree or AST during the Term of the LionTree Agreement was a direct or proximate cause of the investment. Either LionTree or AST had to introduce the potential investor to AST during the Term of the contract, or, if AST was already in contact with the potential investor prior to the beginning of the Term, LionTree or AST would have to do work to further develop or pursue the contact with that potential investor during the Term. Only in circumstances where the work of LionTree or the Company during the Term caused or meaningfully contributed to the closing of a Transaction would LionTree be entitled to a Fee.

Doc 72-2 – pg. 8, ¶ 28. With respect to the clause referencing "introductions," Mr. Severson explains that the term "meant that, during LionTree's exclusive Term,

either AST or LionTree had to obtain an actual meeting, whether face-to-face or over the telephone, with a potential investor." "In other words, the requirement was that LionTree would need to get us 'in the room' with a potential investor with whom we did not already have a relationship." *Id.* at pg. 3, ¶ 11. The clause referencing "where contact was developed or pursued," was proposed by LionTree at the end of negotiations as a "clarifying comment." *Id.* at pg. 5, ¶ 18. The undisputed evidence is that the clause was intended to cover a scenario "where the investor had already been introduced to AST prior to the start of the Term, but where contact with that investor was further developed or pursued by LionTree or AST during the Term such that it resulted in a Transaction." *Id.* at pgs. 5-6, ¶¶ 19-20.

This intent and understanding is consistent with industry standards. "Pursuant to industry standards and established custom and practice, a tail provision of this kind is designed to impose additional requirements on the investment bank (*i.e.*, beyond the requirements of the first tail period) in order for it to be eligible to receive a post-term fee; that is, requiring some level of activity contributing to the ultimate investment or at least furthering the process with the investor." Doc 72-8 – pg. 9-10, 17, ¶¶ 21, 47-49.

Delclaux's position, which rests on a broad construction of the Second Tail such that it can be triggered by any activity with or concerning an eventual investor – however remote, irrelevant, or inconsequential – finds no support in the record

evidence.  The best Delclaux can do is point to a declaration authenticating an email sent from LionTree to AST in June 2020 concerning whether certain contacts with Vodafone and Samsung Next in 2018 could have triggered the Second Tail. Appellant's Brief, pg. 58.  Delclaux fails to mention that this email was just one in a series of communications, which ended when AST explained that the Second Tail was not triggered because (i) nothing materialized from these purported contacts, (ii) investment discussions with both Vodafone and Samsung Next commenced long after these purported contacts, after the Term of the LionTree Agreement ended, and through completely separate channels, and (iii) the two individuals who were purportedly contacted had absolutely no involvement in the eventual negotiation of the transactions.  Doc 72 – pgs. 8-10.

This single piece of indirect evidence does not create a genuine dispute of material fact as to the meaning, scope, and operation of the Second Tail.  Indeed, as the District Court found, the record shows that Delclaux's interpretation runs counter to the express intent of AST as described by Mr. Severson and as reflected in the parties' negotiations.  Doc 72-2 – pgs. 2-7.  It also conflicts with established custom and practice in the industry.  Doc 72-8 – pgs. 9-10, 19-20.  As Mr. Timmins states:

> Consistent with industry custom and practice, the second tail in the LTA Agreement required an introduction to a potential investor or for an existing contact with a potential investor to be further developed or pursued.  The purpose of this and similarly styled tail provisions in private placement fundraising (or M&A) engagements is to ensure that the issuer is only paying banking fees on transactions where activity

done during the term of the investment banking contract contributes in some way to an investment (or acquisition) eventually being closed. Delclaux's position that wholly ineffective and fruitless activity coincidently involving an eventual investor somehow triggers this type of tail provision is inconsistent with industry standards and established custom and practice.

*Id.* at pg. 20, ¶ 62.

While the plain language of the Second Tail Provision is ambiguous, the record evidence concerning its meaning, scope, and operation is not. To trigger the Second Tail, therefore, Delclaux needed to produce evidence that AST closed or signed a Transaction during the covered period with an investor who was introduced to it by LionTree during the Term of the LionTree Agreement or with an investor who was introduced by a third party or prior to the Term, but where contact with that investor was developed or pursued by AST or LionTree during the Term. Moreover, the introduction and/or development or pursuit of contact must have contributed to the subsequent Transaction such that a causal connection was established.

The sworn and undisputed Declarations from each investor and AST detail the interactions between the parties, including when the parties were introduced and by whom, when investment discussions commenced, and who was involved in advancing those discussions toward eventual transactions. *See* Docs 72-2 – 72-7. This testimony is unrefuted and fully consistent with the documentary record generated through discovery. It demonstrates conclusively that AST did not

commence investment discussions with any of the four Series B investors until after the Term of the LionTree Agreement.

Notwithstanding this evidence, Delclaux argues that the Second Tail was triggered with respect to at least two of the Series B investors—Vodafone and Samsung Next. Delclaux's argument is based on a single e-mail from LionTree in January 2018 representing that it had attempted some form of communication with individuals affiliated with those entities. Appellant's Brief, pg. 58. LionTree's "contact log" indicates that both individuals expressed no interest in exploring any potential investment with AST. Doc 72-2 – pgs. 9-10, ¶¶ 61, 73. Undisputed testimony from both Vodafone and Samsung Next reflects that even if such a communication occurred – neither could confirm it did – the individuals purportedly contacted were not involved in negotiating the actual investments with AST. Doc 72-4 – pg. 3, ¶¶ 12-14; Doc 72-7 – pg. 3, ¶¶ 11-13. The investment discussions with both Vodafone and Samsung Next did not commence for another year and a half. Doc 72-4 – pg. 8, ¶ 8; Doc 72-7, pg. 2, ¶ 7. Moreover, nothing in the record shows that LionTree's January 2018 communication had any relationship to or causal connection with those discussions.

Delclaux also argues the Second Tail was triggered by Rakuten's investment. The "evidence" offered here is even more tenuous. Delclaux claims that AST contacted Rakuten through its subsidiary Altiostar in early March 2019 – days before

the Term of the LionTree Agreement expired. Appellant's Brief, pgs. 24, 63.

Delclaux's argument is based on a gross mischaracterization of the cited deposition

testimony. The undisputed testimony is that, in March 2019, AST was doing

preliminary background research on Rakuten in an effort to reach out concerning a

potential commercial arrangement, not an investment. Doc 72 – pg. 9, ¶ 63. AST's

attempt to contact Rakuten through Altiostar "went nowhere," and Altiostar was

"non-responsive." Doc 72-13 – pg. 26, 101:4-13. It is undisputed that AST did not

actually make contact with Rakuten until May 2019 (after the Term of the LionTree

Agreement ended), and it was only after this initial contact that discussions turned

toward a potential investment. Doc 72 – pg. 9, ¶ 62.

In the end, there is nothing in the record to support Delclaux's position that

the Second Tail was triggered. Summary judgment should be affirmed.

## III. THE DISTRICT COURT CORRECTLY REJECTED DELCLAUX'S UNSUPPORTED AND UNPLEADED CLAIMS AND THEORIES UNDER THE RIGHT OF FIRST REFUSAL

In addition to Delclaux's claims for fees under the Tail Provisions, it also

argues that it should be entitled to fees under a separate provision in the LionTree

Agreement that it characterizes as a right of first refusal ("ROFR").[5] The District

Court rejected this claim "[d]ue to procedural irregularities," including that

---

[5] In its summary judgment papers, Delclaux called this the "Additional Transactions" provision or the "Third Tail."

Delclaux did not plead this theory as part of its Amended Counterclaim or even mention the ROFR, yet tried to assert a new claim for the first time during summary judgment. Doc 114 – pg. 11, n. 6. It is well established that parties are not allowed to assert new legal claims or introduce new facts for the first time on summary judgment. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004); *see Newman v. Ormond*, 396 Fed. Appx. 636, 639 (11th Cir. 2010) (affirming district court's decision to deny without discussion newly-raised claims in motion for summary judgment because the liberal pleading standard for civil complaints does not afford plaintiffs an opportunity to raise new claims at summary judgment stage)

Over and above the "procedural irregularities," Delclaux's claim under the ROFR fails based on the undisputed evidence in the record. The undisputed facts are that AST sent LionTree a notice of termination on January 29, 2019. Doc 72 – pg. 3, ¶ 15. Thus, the LionTree Agreement was no longer in effect when the Series B transactions closed, or when the later De-SPAC transaction closed,[6] meaning the ROFR did not apply.

Delclaux seeks to side-step this reality by characterizing the ROFR as a "post-termination right." Appellant's Brief, pg. 20. But there is no support in the record

---

[6] Delclaux seeks fees from the De-SPAC under this theory—a transaction that was never mentioned in the Amended Counterclaim.

that the ROFR survived termination. The termination clause in the LionTree Agreement lists the provisions that survive termination, and the ROFR is not one of them. Doc 81-6 – pgs. 3-5, ¶¶ 8, 13-14. Moreover, the notion that the ROFR survives termination is also absurd and commercially unreasonable. Under Delclaux's interpretation, the ROFR gives LionTree a perpetual entitlement to represent AST on any and every transaction AST might pursue from now until the end of time. *Id.* at ¶ 14. There is no commercially reasonable explanation as to why AST would ever agree to lock itself into such an arrangement. Under New York law, courts "must avoid interpreting a contract in a manner that would be absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." *Cambridge Capital LLC v. Ruby Has LLC,* 2021 U.S. Dist. LEXIS 188635, at *105 (S.D.N.Y. Sept. 30, 2021); *Luver Plumbing Heating, Inc. v. Mo's Pluimbing & Heating*, 144 A.D.3d 587, 588 (N.Y. App. Div. 2016) (quoting *Greenwich Capital Fin. Prods., Inc. v Negrin*, 74 A.D.3d 413, 415 (N.Y. App. Div. 2010)).

Courts must also avoid interpreting contract provisions in ways that result in internal inconsistencies. *National Conv. Corp. v. Cedar Bldg. Corp.*, 23 N.Y.2d 621, 625 (N.Y. 1969). If the ROFR is interpreted as perpetual, AST's termination rights under Section III of the LionTree Agreement are rendered obsolete. Indeed, under Delclaux's reading, only LionTree could ever terminate, since AST would be eternally required to allow LionTree to represent it on all future transactions.

In addition to its absurdity and commercial unreasonableness, Delclaux's interpretation should be rejected because it conflicts with the undisputed evidence as to the Parties' intent as set forth in the record. AST testified at its Rule 30(b)(6) deposition that it did not intend for or understand the ROFR to grant LionTree any perpetual right to act as its investment banker. Doc 81 – pg. 13, ¶¶ 101-102; Doc 72-12 – pgs. 46-47, 180:7-184:7. AST understood that this provision did not survive termination, and there is nothing in the record reflecting a contrary intent or understanding. *Id.* As with the arguments regarding the meaning, scope, and operation of the Tail Provisions, Delclaux has nothing more than its own interpretation of the relevant language to rely upon. But as a non-party, Delclaux's interpretation is irrelevant.

Finally, Delclaux's interpretation of the ROFR should be rejected because it is inconsistent with industry standards and established custom and practice in the context of private placement financings. Doc 81, pg. 13, ¶¶ 103. As explained in an undisputed Declaration of Jim Timmins, provisions of this kind are not included in every investment banking contract, but are not uncommon. Doc 81-6 – pgs. 2-3, ¶ 6. They reflect a presumption between the parties that they will continue working together under terms and arrangements that are mutually agreeable on future transactions that are not covered by the initial engagement. *Id.* at pg. 2, ¶ 4. Because the type of transaction that an issuer might pursue could be very different from the

transaction on which the initial engagement is based, it is difficult to set the terms for that in advance, even if the parties have a desire to continue working together. *Id.* at pgs. 2-3, ¶¶ 6-7. The transaction could be of a size or nature that it outside the expertise or capabilities of the investment bank. *Id.* at pg. 3, ¶ 7. Also, the prevailing market with respect to fees varies widely depending on the type of transaction being pursued. *Id.* Thus, parties often include ROFR provisions whereby they agree to keep working together on future transactions based on terms that will be decided when those transactions occur.

That is the situation with the ROFR in the LionTree Agreement. The ROFR refers to "additional Transaction[s] ***after the initial Transaction***". Doc 70-4 – pg. 4 (emphasis added). The "initial Transaction" was the Series A financing round. The LionTree Agreement did not automatically terminate at the end of the Series A, so the ROFR meant that, as long as the contract remained in effect, LionTree would be entitled to represent AST in a future transaction. When AST first initiated its Series B, it gave LionTree the opportunity to represent it. Eventually, AST decided to change investment banks and exercised its right to terminate. As Delclaux would have it, this termination was essentially meaningless because the ROFR somehow required AST to continue to offer LionTree the opportunity to represent it and collect fees on the transactions that were part of the Series B and only materialized after a new bank was involved. Mr. Timmins states that: "Declaux's position that the

[ROFR] survives termination and creates a perpetual right whereby LionTree is entitled to represent AST on any and every future transaction AST might pursue is wildly out of line and wholly inconsistent with industry standards and with established custom and practice." Doc 81-6 – pgs. 4-5, ¶ 14.

Accordingly, on both procedural and substantive grounds, the District Court's entry of summary judgment in AST's favor with respect to Delclaux's claim for fees under the ROFR should be affirmed.

## IV. THIS COURT CAN AFFIRM THE DISTRICT COURT'S JUDGMENT ON ADDITIONAL GROUNDS

The District Court's decisions provide ample grounds upon which judgment in AST's favor can be affirmed. If necessary, however, this Court can affirm on additional grounds. *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F. 4th 1259, 1263 (11th Cir. 2023) (finding an appellate court may affirm judgment on any ground supported by the record); *Rozar v. Mullis*, 85 F. 3d 556, 564 (11th Cir. 1996) (same).

.  Specifically, judgment in AST's favor is supported in part or in whole for three additional reasons: (1) Delclaux's lack of standing, (2) the unenforceable nature of the Finder's Fee Agreement, and (3) the termination of the Finder's Fee Agreement in January 2020.

First, in its initial response to the Amended Counterclaim, AST moved for dismissal under Fed. R. Civ. P. 12(b)(1). Doc 21. AST argued Delclaux was

attempting to litigate purported legal rights of LionTree through the Amended Counterclaim and, therefore, dismissal was required on grounds of standing and ripeness. The District Court denied AST's motion, concluding that while LionTree's legal right to payment from AST is a condition precedent to the Amended Counterclaim, that issue could be addressed in the form of an affirmative defense and did not "divest the court of jurisdiction." Doc 49. On summary judgment, the District Court correctly determined Delclaux did not satisfy this condition precedent. However, Delclaux should have never been allowed past the initial pleadings stages. This entire case has been an attempt by Delclaux to argue the legal rights of another party. It lacked standing to do that.

Second, the Finder's Fee Agreement is unenforceable as a matter of federal law. The Finder's Fee Agreement presumes that Delclaux would serve as a finder for AST in connection with its Series A and B financings. Doc 70-3 – pg. 3, § 1. Although the Agreement provides that Delclaux will not "perform any act…which (i) would require Finder to be registered as an investment advisor or broker-dealer or (ii) is in violation of any state or federal securities laws in the United States of America or any other relevant securities laws in other jurisdictions," (*Id.*), it also expressly authorizes Delclaux to "assist AST and [LionTree] with efforts relating to [the Series A and B] Financing." *Id.* Moreover, Delclaux's fees are all transaction-based compensation, meaning Delclaux is only paid if securities are successfully

sold and, in that case, Delclaux receives a set percentage of the sale. Doc 81 – pg. 11, ¶ 85. On its face, therefore, the Finder's Fee Agreement is a contract authorizing an unregistered entity (Delclaux) to assist in the sale of securities (in AST's Series A and B rounds), and receive transaction-based compensation upon any successful sales. *Id.* at pgs.10-11, ¶¶ 79-86. Consequently, the Finder's Fee Agreement violates federal securities law and constitutes impermissible fee splitting in violation of FINRA Rule 2040, since fees to Delclaux are simply a portion of fees payable to LionTree, a registered FINRA member. Section 29(b) of the Exchange Act provides that "[e]very contract made in violation of any provisions of this chapter or of any rule or regulation thereunder, and every contract…the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void…as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract…." *See, e.g., Demaria v. Gisbex Clearing Corp., S.A.*, 2010 WL 11553316, at *6 (S.D. Fla. Nov. 23, 2010); *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 205 (3d Cir. 2006); *Abott v. Equity Group, Inc.*, 2 F.3d 613, 628 n.53 (5th Cir. 1993); *Regional Properties, Inc. v. Financial and Real Estate Consulting Co.*, 678 F.2d 552, 560 (5th Cir. 1982) (Plaintiffs allowed to rescind contract with their broker under Section 29(b) for sale of limited partnership interests in Plaintiffs' companies

because broker violated Section 15(a)(1) in not having been registered with the SEC as a broker-dealer).  Since the Finder's Fee Agreement violates federal law, Delclaux cannot enforce it.

Third, judgment in AST's favor can be affirmed with respect to fees sought by Delclaux for the Rakuten, Samsung Next, and New Providence transactions because the Finder's Fee Agreement was terminated by the time any of those transactions closed.  Termination rights are expressly set forth in Section 4 of the Finder's Fee Agreement, which states:

> This Agreement shall automatically terminate upon the completion of a Series B financing. Either AST or Finder, at their sole discretion, may terminate this agreement at any time upon written notice.

The plain meaning of this provision is that termination ends the parties' contractual relationship and extinguishes all contractual rights and obligations. *See Mac's Shell Serv., Inc. v. Shell Oil Products Co., LLC*, 559 U.S. 175, 182-83 (2010) ("The word 'terminate' ordinarily means 'put to an end.'"); *CBS, Inc. v. Primetime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001) (finding "no ambiguity in the word 'termination[,]'" which means "the end of something," "to bring to an end or halt," and "to come to an end").

The undisputed evidence is that AST provided written notice of termination of the Finder's Fee Agreement in January 2020.  It is also undisputed that the Series B transactions with Rakuten and Samsung Next did not close until February 2020,

and the De-SPAC transaction with New Providence did not close until April 2021. The Finder's Fee Agreement is clear that Delclaux has no claim to fees from AST until "the closing of a Financing." Doc 81 – pg. 11, ¶ 85. Accordingly, at the time when the Finder's Fee Agreement was terminated, no fees were owed. Where no fees are owed, there can be no breach of contract for a purported failure to pay.

## CONCLUSION

For the reasons stated above and by the District Court, and for such other reasons as supported by the record, Appellee AST respectfully requests that the judgment entered in its favor be affirmed.

Respectfully submitted,

By:    */s/ Mark J. Neuberger*
Mark J. Neuberger
Foley & Lardner LLP
2 South Biscayne Boulevard
Miami, FL 33133
Telephone: (305) 482-8400
mneuberger@foley.com

Geoffrey M. Raux
Foley & Lardner LLP
111 Huntington Avenue
Boston, Massachusetts 02199
(617) 342-4000
graux@foley.com

*Counsel for Appellee* AST & Science LLC

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the length limit of Fed. R. App. R. Rule 32(a)(7)(B)(i) because, excluding the parts of the documents exempted by Fed. R. App. P. 32(f) this document contains 12,999 words.

This documents complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared using Microsoft Word 2010 in Times New Roman, 14-point font.

*/s/ Mark J. Neuberger*
Mark J. Neuberger

## CERTIFICATE OF SERVICE

I certify that on May 22, 2024, I electronically filed the foregoing with the Clerk of Court using CM/ECF and that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Mark J. Neuberger
Mark J. Neuberger